# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ALBERT J. MARTIN,**

        **Plaintiff,**

   v.                                       Case Nos. 05-C-209 & 05-C-1097

**NORTHWESTERN MUTUAL**
**LIFE INSURANCE COMPANY,**

        **Defendant.**

## DECISION AND ORDER

The *pro se* plaintiff, Albert J. Martin ("Martin"), filed this consolidated action against his former employer, Northwestern Mutual Life Insurance Company ("NML"). He alleges discrimination and retaliation on the basis of his sex, race, color, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Civil Rights Act of 1866 ("Section 1981"). NML filed a motion for summary judgment, which the Court will grant for the following reasons.[1]

---

[1] Martin also filed a motion to schedule an oral argument regarding the disposition of the motion for summary judgment. The parties submitted sufficient arguments in their briefs for the Court to decide the matter without the need for oral argument. Accordingly, Martin's request is denied.

1

**BACKGROUND**

NML hired Martin, a black male, in January 1997 as a Policy Owner Services Representative. In that capacity, he primarily worked in customer service by counseling and advising policyholders. (Defendant's Proposed Findings of Fact ("DPFOF") ¶¶ 5-6). In January 2002, Martin began working in NML's Information Systems ("IS") Department as a NR Programmer Analyst. (*Id*. at ¶ 9.) Barbara Joslin ("Joslin") was Martin's immediate supervisor, and Sam Woodruff ("Woodruff"), a black male, was Martin's Resource Manager. As the Resource Manager, Woodruff was a human resources contact who would collect input and guide Martin in his development. (*Id*. at ¶¶ 11, 17, 18, & 21.)

I.  Martin's Employment and Termination at NML

In the fall of 2003, Joslin observed that Martin often became upset whenever she discussed performance issues with him. (*Id*. at ¶ 32.) As a result, Woodruff advised Martin at that time to (1) accept feedback and evaluate it before he discarded it as criticism; (2) stop making the excuse that he was new; (3) use his resources before asking for help; and (4) earn respect by becoming a contributor at meetings. (*Id*. at ¶ 33.)

In October 2003, Martin expressed his anger at Joslin about the amount of training he was receiving. (*Id*. at ¶¶ 34-35.) Not satisfied with Joslin's response, on October 17, 2003, Martin sent Woodruff an e-mail that was entitled: "Actuate Training: Sam I'm furious!!!!!!!!" It stated, in part:

> Maybe furious is not the word. I'm beyond furious!!!!!!!!!!!!!!!!!!.... Be prepared to discuss this big time in our next meeting.

2

(*Id*. at ¶ 39.)

Martin expressed frustration about his lack of training again in the spring of 2004. (*Id*. at ¶ 76.)

On June 21, 2004, in a meeting with Joslin, Martin: (1) told Joslin that she had not done anything for Martin or Stapel, a white male, when it came to development and training; (2) accused Lois Brazner ("Brazner"), the new Resources Manager, of lying; and (3) told Joslin to "Keep your set of notes and let Lois keep her set of notes, because when I show that she is lying, HR will take care of her." (*Id*. at ¶ 92.) He wagged his finger at Joslin in anger when he communicated with her. (*Id*. at ¶ 95.) At the end of the meeting Martin asked Joslin's supervisor, Scott Wallace, to come to Joslin's office. When Wallace said he did not recall the answer to Martin's question, Martin told Wallace: "You can either answer the questions here, or we can have this conversation in human resources." (*Id*. at ¶ 94.) Joslin perceived Martin's behavior as frightening, angry, aggressive and accusatory. (*Id*. at ¶ 96.) Martin later apologized to both Wallace and Joslin for his display of anger at this meeting. (*Id*. at ¶ 97.)

After the June 21, 2004 meeting, Martin met with John Dowell ("Dowell"), a black male who is NML's Director of Diversity, Dick Clement ("Clement"), a white male who was Brazner's supervisor, and Karla Hill ("Hill"), a black female who was Director of Staffing. (*Id*. at ¶ 99.) As part of that meeting, Martin was reprimanded for finger pointing and calling his manager a liar during the June 21, 2004 meeting. (*Id*.)

3

On July 6, 2004, Brazner sent Martin an e-mail that expressed her concerns about his performances. (*Id*. at ¶ 101.) The next day, July 7, 2004, Martin met with Dowell to speak with him about what he considered the "exaggerations" of Brazner. (*Id*. at ¶ 104.) Dowell perceived Martin to be walking aggressively towards him in an agitated fashion with closed fists while raising his voice. (*Id*. at ¶ 104.) As a result, Dowell retreated towards the window. (*Id*. at ¶ 105.) Martin admits that he was upset during his meeting with Dowell. (*Id*. at ¶ 107.)

During his meeting with Dowell, Martin told him about a conversation that he had recently with Joslin. Reportedly, Martin told Joslin: "This is what I said and this is what you exaggerated. I am going to use your documents and your e-mails and your statement to hang you in court." (*Id*. at ¶ 111.) Joslin reportedly responded, "This is not a court of law," to which Martin said, "By the time you get done, it will be." (*Id*.) After seeing Martin's anger and hearing of his conversation with Joslin, Dowell told Martin to go home early. (*Id*. at ¶ 113.)

Based on Martin's conduct, NML decided to send Martin to its Employee Assistance Program ("EAP"). On July 8, 2004, Martin met with Linda Carey, an occupational nurse at NML. Carey asked Martin if he was thinking of harming himself. (*Id*. at ¶ 115.) Martin responded, "Ms. Carey, oh, my God, I am not that kind of person to hurt myself. However, if I ever decide to commit suicide, I'd have to take a couple of people with me." (*Id*. at ¶

4

115.) Martin later claimed he was only joking, but Carey reported the incident to Human Resources. (*Id*. at ¶ 116.)

On July 16, 2004, Dowell and Brazner told Martin that he may return to work on July 19, 2004. They also told Martin that he must: (1) not display intimidating or threatening behaviors; (2) not disrupt others' work; (3) not discuss with co-workers his feelings about the performance situation during working hours; (4) not create an atmosphere of disrespect, and (5) work only during his scheduled hours and not to come in on weekends unless he has prior approval. (*Id*. at ¶ 123.)

Less than a month later, on August 12, 2004, NML received a charge from the United States Equal Employment Opportunity Commission ("EEOC") that Martin had filed. (*Id*. at ¶ 124.) According to the notice, Martin alleged that NML discriminated against him on the basis of his race, sex, and disability by (1) denying him training opportunities in October 2003; (2) issuing "documentation towards him" that he believed exaggerated some of his statements and gave the false appearance that he was performing poorly; (3) placing him on a performance plan; (4) sending him home early on July 7, 2004; and (5) denying him access to the NML facility between July 8, 2004 and July 19, 2004. (*Id*.) That same day, August 12, 2004, Brazner gave Martin a memo regarding his performance that indicated that NML was pleased with his progress. (*Id*. at ¶ 124.) Indeed, Martin indicated that "things were generally going well at work" between August 2004 and October 8, 2004. (*Id*. at 128.)

5

On October 8, 2004, Brazner gave Martin a memo that addressed certain concerns about his performance. (*Id*. at ¶ 129.) Three days later, on October 11, 2004, Martin met with Clement, Joslin, and Brazner about his performance, and Joslin said Martin was very angry and stormed out of her office when she indicated that he had not followed certain procedures. (*Id*. at ¶ 131.)

After the October 11, 2004 meeting, Joslin continued to perceive Martin as being angry and aggressive. (*Id*. at ¶ 123.) Based on his behavior, Joslin became extremely fearful and concerned about her safety, so she took the following protective actions: (1) rearranged her office furniture so that it faced the door; (2) confirmed with security on how to contact them in the event of a problem with Martin; (3) arranged for a co-worker to call security if Martin barged into her office; and (4) arranged for an escort to walk her to her car after work. (*Id*. at ¶ 133.)

On October 15, 2004, Brazner gave Martin a memo that stated that his inappropriate conduct at the October 11, 2004 meeting violated the conditions upon which they allowed him to return to work in July 2004. (*Id*. at ¶ 140.) The memo also stated that if Martin engaged in any further acts of unprofessional conduct, NML might terminate him. (*Id*.) After Martin read the memo, he sent an e-mail to a number of managers, in which he stated that NML had the right to terminate him, but he had the right to make the matter public. (*Id*. at ¶ 144.) After he packed his belongings into a box and took them to his car, he left the premises to buy a bullhorn. (*Id*. at ¶ 146.) Late in the afternoon on October 15, 2004, he

6

stood across the street from NML and read the contents of the memo he had just received into the bullhorn. (*Id*.) He also shouted comments into the bullhorn about (1) his co-workers; (2) NML's failure to hire minorities; and (3) that had taken the matter to the EEOC and that he would not mediate the case. (*Id*. at ¶ 146.)

The next day, Saturday, October 16, 2004, Martin phoned Dowell to ask for certain e-mail messages. (*Id*. at ¶ 151.) The next day, on Sunday, October 17, 2004, Martin called Dowell again demanding that he receive certain e-mails so that he could file a report with the Security Exchange Commission ("SEC"). (*Id*. at ¶ 152.) Martin then called the FBI and then drove downtown to observe whether anyone took his computer out of the building. (*Id*. at ¶ 153.) While he was standing outside the building, he saw Dowell enter the building. (*Id*. at ¶ 155.) Martin then immediately called Dowell and told him that he just observed him walk into the building, to which Dowell responded, "Are you following me?" (*Id*. at ¶ 155.) Dowell was upset and extremely concerned about Martin's conduct over that weekend. (*Id*. at ¶ 157.)

On Monday, October 18, 2004, Dowell and Todd Smasal ("Smasal"), who is the Director of Employee Relations, met with Martin to discuss his behavior over the past several days. (*Id*. at ¶ 158.) Martin said that he was extremely angry with NML, that he had gotten to the point where "all consequences be damned," and that "anger is not rational." (*Id*. at ¶¶ 159-60.) Dowell and Smasal perceived Martin's comments as threatening. Three days later, on October 21, 2004, Dowell and Smasal met with Martin again and gave him a memo

stating that he was terminated for engaging in numerous acts of intimidating and threatening behavior. (*Id*. at ¶ 163.)

On February 3, 2005, Martin filed another charge with the EEOC. This time, he alleged that he was terminated in retaliation for filing a charge of discrimination in August 2004. (*Id.* at ¶ 169.)

II.     Martin's Health Condition

In 1985, Martin was diagnosed with anxiety disorder, agoraphobia, and social phobia. (*Id*. at ¶ 173.) As a result, Martin estimates that prior to June 2004, he would sometimes need to stay an hour or two later on Fridays to complete tasks that he could not finish during his regularly scheduled work period. (*Id*. at ¶ 177.) After June 2004, when his supervisors told him that he was not supposed to be working after hours, Martin said he "pushed" himself to finish his work during the normal work period. (*Id*. at ¶ 178.)

In July 2004, Dr. Hugh Smith prepared a form that recommended that Martin should be given longer deadlines, written instructions, a job coach or mentor, and changes in training. (*Id*. at ¶ 228.) Accordingly, when Dowell and Brazner met Martin on July 16, 2004, they discussed with Martin the need for accommodations. (*Id*. at ¶¶ 251, 259-62.) Martin told Dowell and Brazner at that meeting that he wanted the following accommodations: (1) prior to meetings to discuss performance, the message be put in writing and include examples; (2) performance meetings should be scheduled away from training; (3) written communications on performance be authored by Joslin so as to avoid

8

"exaggerations" and "twisting" of information by Brazner; and (4) new person setup duties be removed from his duties because data entry was not his strength. (*Id*. at ¶ 228.) On July 27, 2004, Brazner and Dowell told Martin that they could accommodate all of his requests except for removing his data entry duties. (*Id*. at ¶ 231.)

In August and September 2004, Martin reported to his doctor that his work situation had improved, he was less anxious at work, and that he was doing a better job. (*Id*. at ¶ 236-38.) Between September 2004 and January 2007, Martin did not meet with any doctors. (*Id*. at ¶ 213.)

## STANDARDS OF REVIEW

A court will grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. When considering the movant's case, the Court takes all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hall v. Bennett*, 379 F.3d 462, 465 (7th Cir. 2004). If the movant meets his burden, the nonmovant may not rest on the pleadings. Instead, the nonmovant must come forward with evidence that there is a genuine issue for trial that would support a reasonable jury verdict on every issue for which he bears the

9

burden of proof at trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *Celotex Corp.*, 477 U.S. at 322-24. If the nonmoving party bears the burden of proof on a matter at trial, and he is unable "to establish the existence of an element essential to [his] case," summary judgment is appropriate. *Celotex*, 477 U.S. at 322-23.

**DISCUSSION**

Martin makes several allegations. First, Martin contends that NML discriminated against him on account of his race, color, sex, and alleged disability by terminating him. He also avers that NML terminated him in retaliation for filing a complaint to the EEOC in August 2004. In addition, Martin contends that NML did not provide reasonable accommodations for his alleged disability. And finally, Martin believes that NML was both discriminatory and acted in retaliation by conducting more intensified reviews, denying him access to NML's facilities for a short period of time, not providing adequate training, giving undesirable work assignments, and failing to provide his personnel file to him in a timely way after he was terminated. None of Martin's allegations have merit, and all of them must be summarily dismissed for the reasons explained below.

I.  Discrimination Claims on the Basis of Race, Color, and Sex

Federal law prohibits an employer from terminating an employee, or otherwise taking any adverse action against an employee, on account of a person's race, color, or sex. *See* 42 U.S.C. § 2000e-2(a)(1). To prove such a violation, a plaintiff must proffer either direct or

10

indirect evidence of the employer's discriminatory intent. *See Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). Martin does not provide any direct evidence, so he must proceed under the indirect method of proof.

Under the indirect method, the plaintiff must first establish a *prima facie* case, which entails four elements: (1) the plaintiff is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered a materially adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *See Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007). Martin failed to make his *prima facie* case in several respects.

First, Martin's discrimination claims fail because he never identifies an individual who he alleges was similarly situated and was treated more favorably. Martin must show that he was treated more harshly than a similarly situated employee outside of his protected class, and that he is "similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Typically, this involves showing that the employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 617-18. Martin simply does not identify an employee outside of his class who was in a similar position. Accordingly, on that basis alone his discrimination claims fail.

11

He also does not demonstrate that he performed his job satisfactorily. Rather, the record is full of examples of Martin acting unprofessionally and disruptively. He was disruptive and unprofessional by exhibiting angry and intimidating behavior when his supervisors discussed performance issues with him, by calling Brazner a liar, by making comments that Dowell reasonably took to mean that Martin wanted to "hang" his supervisors, by saying that if he committed suicide he might take a few people with him, and by reading a memo into a bullhorn across the street from NML's building during business hours. His unprofessional and disruptive behavior indicates that he did not perform his job satisfactorily. *See Booze v. Shawmut Bank, Conn.*, 62 F. Supp. 2d 593, 597-98 (D. Conn. 1999) (finding that the plaintiff failed to establish that she performed the job satisfactorily when there was evidence of her disruptive and unprofessional conduct at work).

And finally, while his termination was an adverse employment action, his other complaints do not rise to that level. An adverse action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Rather, a materially adverse action "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id*. Martin fails to provide such evidence. Conducting more intensified reviews, denying access to facilities for a short period of time in July and October 2004, not providing certain training

12

opportunities, giving undesirable work assignments, and failing to provide Martin his personnel file in a timely way after he was terminated did not cause a materially adverse change in his working conditions.

Martin has plainly failed to establish his *prima facie* case. Accordingly, the Court must dismiss his claims of discrimination.

II.     Retaliation Claims

Martin also claims that NML terminated him in retaliation for filing an EEOC complaint in August 2004.[2] Like his discrimination claims, Martin may prove retaliation in violation of Title VII by either the direct or indirect methods of proof.

The direct method requires Martin to show a causal connection between the adverse employment action and his statutory protected activity. *See Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). The closest Martin comes to providing such evidence is Dowell's alleged statement that because Martin refused to mediate his EEOC charge, Dowell would not ask Martin's supervisors to stop reprimanding him. (Martin Dep. 228, 234-35.) However, Dowell did not say that his job was in jeopardy for failing to mediate, nor did he suggest that his supervisors' scrutiny of him was improper. (DPFOF ¶

---

[2] Martin also alleges that NML retaliated against him by conducting more intensified reviews, denying him access to NML's facilities for a short period of time in July and October 2004, not providing certain training opportunities, giving undesirable work assignments, and failing to provide his personnel file to him in a timely way after he was terminated. As the Court explained in the previous section, though, those are not examples of adverse employment actions. Thus, Martin cannot sustain a retaliation claim on the basis of those activities. *See Sweeney v. West*, 149 F.3d 550, 555 (7th Cir. 1998).

13

271.) At the same meeting, Dowell asked Martin what could be done to make Martin successful at NML and whether Martin would prefer working in another area of NML. (*Id.* at ¶ 272.) These statements, making no reference at all to any adverse employment action, do not constitute evidence of a causal link between the protected activity and his eventual termination. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000); *Cronin v. Kenosha Unified Sch. Dist.*, 2007 WL 601885, at *7 (E.D. Wis. Feb. 23, 2007).

Under the indirect method of proof, Martin must establish a *prima facie* case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he met NML's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). The Court already explained, in the context of analyzing his discrimination claims, that Martin failed to meet NML's legitimate expectations by performing his job satisfactorily. Also, like his discrimination claims, Martin failed to identify any employee who he alleged was similarly situated and who was treated more favorably. Martin's retaliation claims, therefore, must be dismissed.

III. The ADA Claims

Martin also alleges that NML terminated him in violation of the ADA, under which NML cannot "discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). In order to establish a *prima facie* case, Martin must show

14

that (1) he is disabled; (2) he can perform the essential functions of the position, and (3) he suffered an adverse employment action because of his disability. *Kupstas v. City of Greenwood*, 398 F.3d 609, 611 (7th Cir. 2005). Martin's claim fails because he does not provide evidence that he is disabled.

> The ADA provides the following definition of "disability":
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.
>
> 42 U.S.C. § 12102(2).

Martin fails to provide evidence of being substantially limited in a major life activity, or that he was regarded as having such an impairment by NML. At most, he only provides references to medical records attached to his affidavit that only address Martin's diagnoses, which are not sufficient. *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002) (stating that it "is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."). He also does not provide any evidence demonstrating that NML regarded him as having limitations that substantially limited a major life activity. Accordingly, his ADA claim of discrimination must fail.

He also alleges that NML violated the ADA by not providing reasonable accommodations. However, because Martin was not disabled, NML did not have a duty to

15

accommodate him. *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Furthermore, NML provided Martin with the accommodations he sought, except that it did not remove his data entry duties. (DPFOF ¶¶ 228, 231.)

Because Martin failed to establish a *prima facie* case for his discrimination, retaliation, and ADA claims, the Court must grant summary judgment in favor of NML.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

NML's Motion for Summary Judgment (Docket No. 70) is **GRANTED**.

Martin's Motion for Oral Argument (Docket No. 93) is **DENIED**.

Dated at Milwaukee, Wisconsin this 8th day of February, 2008.

**BY THE COURT**

s/Rudolph T. Randa
**Hon. Rudolph T. Randa
Chief Judge**

16